# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BRENDA GRAHAM,                      )
                                    )
                Plaintiff,          )
                                    )
        v.                          )          1:18CV403
                                    )
ANDREW M. SAUL,                     )
Commissioner of Social Security,[1] )
                                    )
                Defendant.          )


## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Brenda Graham, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"), Supplemental Security Income ("SSI"), and Disabled Widow's Insurance Benefits ("DWIB"). (Docket Entry 2.)[2] Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment

---

[1] The United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security on June 4, 2019, and he took the oath of office on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Nancy A. Berryhill as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The Act principally "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig v. Chater, 76 F.3d 585, 589 n.1 (4th Cir. 1996) (internal citations omitted). An individual establishes the disability-related criteria of DWIB using the same standards as apply in DIB and SSI claims. See 42 U.S.C. § 402(e)(1)(B) (incorporating the definition of "disability" in 42 U.S.C. § 423(d)).

(Docket Entries 12, 14; <u>see also</u> Docket Entry 13 (Plaintiff's Memorandum); Docket Entry 15 (Defendant's Memorandum); Docket Entry 16 (Plaintiff's Reply)).  For the reasons that follow, the Court should enter judgment for Defendant.

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB, SSI, and DWIB, alleging a disability onset date of August 1, 2010.  (Tr. 914-33.)  Upon denial of those applications initially (Tr. 651-92, 782-95) and on reconsideration (Tr. 693-749, 803-28), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 829-30).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 612-50.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 750-66.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 17-23, 909-13), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1.  [Plaintiff] meets the insured status requirements of the . . . Act through September 30, 2013.

2.  It was previously found that [Plaintiff] is the unmarried widow of the deceased insured worker and has attained the age of 50. [Plaintiff] met the non-disability requirements for [DWIB].

. . .

3.   The prescribed period [for DWIB] ends on January 31, 2020.

4.   [Plaintiff] engaged in substantial gainful activity during the following periods: August 1, 2010 through July 31, 2013.

. . .

5.   However, there has been a continuous 12-month period(s) during which [Plaintiff] did not engage in substantial gainful activity.   The remaining findings address the period(s) [Plaintiff] did not engage in substantial gainful activity.

6.   [Plaintiff] has the following severe impairments: obesity, degenerative joint disease, status post LINQ placement, nicotine dependence, osteoarthritis, depression, and anxiety.

. . .

7.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

8.   . . . [Plaintiff] has the residual functional capacity to perform medium work . . . except [Plaintiff] must avoid concentrated exposure to pulmonary irritants such as dusts, odors, fumes and gases.   She is limited to simple, routine, repetitive tasks, no fast pace production work with few workplace changes.

. . .

9.   [Plaintiff] is capable of performing past relevant work as a classifier.   This work does not require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity.

. . .

In the alternative, considering [Plaintiff's] age, education, work experience, and residual functional

capacity, there are other jobs that exist in significant numbers in the national economy that [Plaintiff] also can perform.

. . .

10. [Plaintiff] has not been under a disability, as defined in the . . . Act, from August 1, 2010, through the date of this decision.

(Tr. 755-66 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan,

993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402

U.S. 389, 401 (1971)). "It consists of more than a mere scintilla

of evidence but may be somewhat less than a preponderance." <u>Mastro</u>

<u>v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal

quotation marks omitted). "If there is evidence to justify a

refusal to direct a verdict were the case before a jury, then there

is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal

quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not

undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute its judgment for that of the [ALJ, as

adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal

brackets and quotation marks omitted). "Where conflicting evidence

allows reasonable minds to differ as to whether a claimant is

disabled, the responsibility for that decision falls on the

[Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks

omitted). "The issue before [the Court], therefore, is not whether

[the claimant] is disabled, but whether the ALJ's finding that [the

claimant] is not disabled is supported by substantial evidence and

was reached based upon a correct application of the relevant law."

<u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that

"[a] claimant for disability benefits bears the burden of proving

a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981),

and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)). "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) the ALJ "err[ed] in finding that [Plaintiff] can perform past relevant work [('PRW')] as a [C]lassifier" (Docket Entry 13 at 4 (bold font and underscoring omitted); see also Docket Entry 16 at 1-3);

2) the ALJ "err[ed] by failing to incorporate non-exertional limitations on the ability to stay on task where the [ALJ] first f[ound] that [Plaintiff] was moderately impaired in the maintenance of concentration, persistence, or pace [('CPP')]" (Docket Entry 13 at 6 (bold font and underscoring omitted));

---

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

3) the ALJ "dr[ew] conclusions that [we]re unwarranted and unsupported by the record or by reason" (id. at 14 (bold font and underscoring omitted); see also Docket Entry 16 at 3-5);

4) "[i]n discussing opinion evidence, the [ALJ] substitutes boilerplate for consideration of the evidence and reasoned conclusions" (Docket Entry 13 at 18 (bold font and underscoring omitted); see also Docket Entry 16 at 5-7); and

5) "[i]n discussing the opinion evidence, the ALJ failed to reconcile portions of the nonexamining consultant's opinion as to mental functioning" (Docket Entry 13 at 20 (bold font and underscoring omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 15 at 1-20.)

## 1. PRW as a Classifier

In Plaintiff's first assignment of error, she alleges that the ALJ "err[ed] in finding that [Plaintiff] can perform [PRW] as a classifier." (Docket Entry 13 at 4 (bold font and underscoring omitted).) In particular, Plaintiff asserts that she performed the classifier job in 1997, i.e., more than 15 years before her date last insured of September 30, 2013, and "did not post earnings greater than the presumptive amount [for substantial gainful activity ('SGA')] for the period of her work." (Id. at 5 (citing Tr. 642).) According to Plaintiff, "the [ALJ's] step four finding regarding the [RFC] is also in error, [] which means that [the

ALJ's error regarding the classifier job] is not harmless and requires vacating, reversing, and remanding the decision for a new hearing." (Id.) Plaintiff's contentions do not warrant relief.

The Commissioner's regulations define PRW as "work that [a claimant has] done within the past 15 years, that was [SGA], and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). Generally, the Commissioner considers a claimant's earnings in the 15 years prior to the disability adjudication at issue or 15 years prior to the date the claimant last met the disability insured status requirements, if earlier, Social Security Ruling 82-62, Titles II and XVI: a Disability Claimant's Capacity to Do Past Relevant Work, in General, 1982 WL 31386, at *2 (1982) ("SSR 82-62"), which in the instant case would capture Plaintiff's earnings from September 30, 1998, to September 30, 2013, her date last insured. In evaluating whether work activity qualifies as SGA, the amount of earnings represents the "primary consideration." 20 C.F.R. §§ 404.1574 (a)(1), 416.974(a)(1). Thus, to assist in determining whether a claimant's past work constitutes SGA, the regulations establish earnings thresholds below which work generally does not qualify as SGA. See 20 C.F.R. §§ 404.1574(b)(2), 416.974(b)(2).

As an initial matter, both parties appear to have assumed that the VE categorized Plaintiff's prior work as a pricer with Carolina Value Village, Inc. in 1997 as the Classifier job in the Dictionary

10

of Occupational Titles ("<u>DOT</u>").  (<u>See</u> Docket Entry 13 at 5; Docket
Entry 15 at 2-3; Docket Entry 16 at 1-3.)  However, the following
colloquy between the ALJ, the VE, and Plaintiff at the hearing
confirms that the VE identified Plaintiff's previous position as a
<u>sorter for Rental Uniform Service of Statesville, Inc.</u> as the
Classifier job:

| | |
|---|---|
| [ALJ]: | . . . [A]t this time, would you please identify [Plaintiff's] past work and the relevant [<u>DOT</u>] information? |
| [VE]: | Yes, ma'am.  Past work would include work of a waiter/waitress, informal, with a [<u>DOT</u>] number of 311.477-030. [Specific Vocational Preparation ('SVP')] of 3, strength level of light.  And also work as a cleaner, housekeeping, with a [<u>DOT</u>] number of 323.687-014.  SVP of 2, strength level of light. |
| [ALJ]: | . . . <u>I have sorter and clean-up crew and priced items . . . . [T]he date last insured expired September 30th, 2013. So we go back to 1998</u>.  Ma'am, when were you a price sorter? |
| [PLAINTIFF]: | . . . I think that job right there that you're talking about is a place called Value Village, and that was – oh gosh.  I want to say 16 years ago or more. |
| . . . | |
| [ALJ]: | . . . Value Village was in '97 and then '98 was Rental Uniforms, Jangle [sic] Rental Uniforms in '99. . . .  And how much work did you do for Rental Uniforms? |
| [PLAINTIFF]: | I think that I worked there maybe eight months – six or eight months. |
| [ALJ]: | What did you do there? |

[PLAINTIFF]:        . . . [I]f you get a rack of shirts –

. . .

And they've all got numbers on them and
you to get, like, five to six numbers of
those shirts and put them together and
take, like, a red tie and tie around
them, hand them back on the rack, and get
them ready to go out to the dock to be
loaded on the truck to be taken wherever
they go.

[ALJ]:              . . . And how much did you earn there?

[PLAINTIFF]:        Wow.  That's been so long ago, I do not
remember.  But I'm sure that it was
probably minimum wage.

[ALJ]:              Was that full-time?

[PLAINTIFF]:        Monday through Friday, yes, ma'am.

. . .

[ALJ]:              . . . And is that the sorter position,
then?  Would that sound like that []?

[VE]:               Yes, ma'am, Your Honor.

. . .

That job would be defined as
[C]lassifier, with the [DOT] number of
361.687-014.  SVP of 2, strength level of
light.

(Tr. 641-43 (emphasis added).)

As emphasized above, the ALJ asked the VE to classify the jobs
Plaintiff listed in the "Job History" section of a Disability
Report, which reflected prior work as part of an after hours "clean
up crew," a "housekeeper" at a motel, an individual who "priced
items" in a retail store "like a Goodwill store," a "sorter" in a

12

laundry, and a "waitress" in a tavern. (Tr. 950 (standard capitalization applied); see also Tr. 641.) The ALJ made clear at the outset of the colloquy that the relevant period for consideration of PRW began in 1998. Although the ALJ confused matters a bit by referring to Plaintiff's job as a pricer at Value Village as a "price sorter," which, at least in title, combined Plaintiff's job as a "sorter" for the laundry and Plaintiff's pricer job with Value Village (Tr. 642), the discussion then focused on the duties of Plaintiff's past job as a sorter in 1998 and 1999, rather than her work as a pricer at Value Village in 1997 (see Tr. 642-43.) At the conclusion of that discussion, the ALJ confirmed with the VE that the duties Plaintiff described performing for Rental Uniform Services in 1998 and 1999 corresponded to the "sorter" in a laundry position on Plaintiff's "Job History" information, and the VE then testified that the DOT defined that job as Classifier. (See Tr. 643; see also DOT, No. 361.687-014 (Classifier in Laundering Occupations), 1991 WL 672991 (G.P.O. 4th ed. rev. 1991 (describing duties such as "[s]ort[ing] laundry into lots" and "[p]lac[ing] sorted articles in bins, nets, or baskets, or onto conveyor belt" (emphasis added)).)

Moreover, Plaintiff's prior work as a sorter/Classifier qualifies as PRW. Performed in 1998 and 1999, that work falls within the relevant period for PRW in this case from September 30, 1998, to September 30, 2013. In addition, Plaintiff reported that,

13

as a sorter, she worked eight hours per day and five days per week, as well as that she earned $6.00 per hour. (See Tr. 950.) Thus, Plaintiff's own statements establish that she earned at least $960 per month as a sorter, well above the presumptive levels for SGA in 1998 and 1999. See https://www.socialsecurity.gov/oact/cola/sga.html (1998 - $500; 1999 - $500 (first half of year)), $700 (second half of year)) (last visited May 31, 2019). Finally, because Plaintiff earned a total of $5,988.86 as a sorter (see Tr. 940), at a rate of approximately $960 per month, Plaintiff performed that job for approximately six months. Because the Classifier job has an SVP of 2, meaning that an individual can learn the job within a maximum of one month, see DOT, No. 361.687-014, 1991 WL 672991, Plaintiff performed the sorter job long enough to learn how to perform it, see 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1).

In sum, Plaintiff's first assignment of error fails as a matter of law.[6]

---

[6] Even if the ALJ had erred in finding that Plaintiff remained capable of performing her PRW as a Classifier, any such error would remain harmless in this case. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). Here, the ALJ made an alternative step five finding that other jobs existed in significant numbers in the national economy that Plaintiff could perform (see Tr. 764-66) and, as explained in more detail in connection with Plaintiff's remaining assignments of error, Plaintiff has not demonstrated prejudicial error with respect to the RFC or otherwise challenged the ALJ's alternative step five finding.

## 2. CPP

Next, Plaintiff asserts that the ALJ "err[ed] by failing to incorporate non-exertional limitations on the ability to stay on task where the [ALJ] first f[ound] that [Plaintiff] was moderately impaired in the maintenance of [CPP]." (Docket Entry 13 at 6 (bold font and underscoring omitted).) In particular, Plaintiff contends that the Fourth Circuit "held that an ALJ does not account for a claimant's limitations in CPP by restricting the RFC or the hypothetical question to the [VE] to simple, routine, or repetitive tasks [('SRRTs')]," because "'the ability to perform simple tasks differs from the ability to stay on task[, and o]nly the latter limitation would account for a claimant's limitation in [CPP].'" (Id. (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)).) This challenge lacks merit.

The Fourth Circuit has indeed held that "the ability to perform simple tasks differs from the ability to stay on task" and that "[o]nly the latter limitation would account for a claimant's limitation in [CPP]." Mascio, 780 F.3d at 638. However, as a neighboring district court has explained:

> Mascio does not broadly dictate that a claimant's moderate impairment in [CPP] always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision . . . . An ALJ may account for a claimant's limitation with [CPP] by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or

other evidence that is sufficiently evident to the reviewing court.

Jones v. Colvin, No. 7:14CV273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015) (magistrate judge's recommendation adopted by district judge) (unpublished) (emphasis added); see also Hutton v. Colvin, No. 2:14CV63, 2015 WL 3757204, at *3 (N.D.W. Va. June 16, 2015) (unpublished) (finding reliance on Mascio "misplaced," because ALJ "gave abundant explanation" for why the claimant could perform unskilled work despite moderate limitation in CPP, by highlighting his daily activities and treating physicians' opinions). Here, the ALJ's decision provides a sufficient explanation as to why a restriction to SRRTs (Tr. 759) adequately accounted for Plaintiff's moderate deficit in CPP.

First, the ALJ discussed Plaintiff's testimony that she "has problems with her nerves" (Tr. 760; see also Tr. 623, 631) and her complaints to medical providers "of increased stressors at home, problems sleeping, nervousness[, ] panic attacks[,] . . . loss of interest, sense of failure, and anxiety" (Tr. 761; see also, e.g., Tr. 1238-47, 1332-47). However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms not entirely consistent with the medical evidence and other evidence in the record for the reasons discussed" in subsequent portions of the decision. (Tr. 760.) Moreover, as discussed below, Plaintiff's challenge to the ALJ's

16

assessment of Plaintiff's subjective symptoms (see Docket Entry 13 at 14-17) lacks merit.

Second, the ALJ summarized Plaintiff's mental health treatment and daily activities, making the following, pertinent observations:

- "[Plaintiff] related experiencing abuse as a child which has affected her recently with flashbacks and anxiety, however[,] . . . [Plaintiff] was able to work for several years" (Tr. 761);

- "[m]ental status evaluation was unremarkable with the exception of [Plaintiff's] mood being depressed at times" (id.);

- "[Plaintiff] reported her symptoms improved after several therapy sessions" and "that she was able to use the techniques she obtained in therapy to reduce her mental health symptoms and improve her activity level" (id.; see also Tr. 1332-47);

- "[Plaintiff] indicated she is able to take care of her personal needs without assistance, take care of her cat, cook for herself, do household chores while taking breaks, [] shop for herself[,] . . . manage her finances, [and] drive . . . a car" (Tr. 759; see also Tr. 618, 628, 632-34, 966, 976-83, 1141).

Those mild mental health findings and varied daily activities lend support to the ALJ's finding at step three that, despite moderate deficit in CPP, Plaintiff could "sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in routine and repetitive, not detailed or complex, work settings." (Tr. 758.)

Third, the ALJ discussed and weighed the opinion evidence as it related to Plaintiff's ability to function mentally. (See Tr. 761-64.) In that regard, the ALJ gave "significant weight" to the

state agency psychological consultant at the reconsideration level of review (Tr. 763), who found that, notwithstanding moderate limitation in CPP (see Tr. 703, 721, 739), Plaintiff remained able to "maintain attention and concentration for 2 hours at a time as required for the performance of simple tasks" (Tr. 707, 725, 743 (emphasis added)). The Fourth Circuit has found an ALJ's reliance on a substantially similar opinion from a state agency psychological consultant sufficient to account for moderate limitations in CPP under Mascio. See Sizemore v. Berryhill, 878 F.3d 72, 80-81 (4th Cir. 2017) (finding ALJ's crediting of consultant's opinion that the claimant "would generally be able to maintain [attention] for at least two [hours] at a time as needed to do simple, routine tasks" satisfied Mascio).

Plaintiff focuses the majority of her CPP-based argument on the purported insufficiency of the ALJ's restriction to "no fast pace production work." (See Docket Entry 13 at 6-10 (citing cases finding non-production restrictions inadequate under Mascio).) In that regard, Plaintiff asserts that the non-production restriction here contains the modifier "fast pace," which makes it difficult "to determine what specific types of production work are excluded, and which permitted." (Id. at 10; see also id. ("What one person deems 'fast' may be considered 'slow' by another.").) These assertions entitle Plaintiff to no relief for four reasons.

First, as the discussion above makes clear, the ALJ's evaluation of Plaintiff's subjective symptoms and mental health treatment, as well as the ALJ's crediting of the state agency psychological consultant's opinion regarding Plaintiff's ability to stay on task, independently suffice under Mascio to sustain a restriction to SRRTs alone, notwithstanding Plaintiff's moderate deficit in CPP. See Sizemore, 878 F.3d at 80-81. Thus, the ALJ's inclusion in the RFC of further restrictions to "no fast pace production work" and "few workplace changes" (Tr. 759) simply represent an additional (but not necessary) ground on which to find that the ALJ satisfied the requirements of Mascio.

Second, a review of recent decisions from the Fourth Circuit addressing non-production restrictions in the context of Mascio bolster the conclusion that the ALJ's restrictions to "no fast pace production work" and "few workplace changes" (id.) also properly accommodate Plaintiff's moderate limitation in CPP. As another judge of this Court recently reasoned:

> In [Perry v. Berryhill, 765 F. App'x 869 (4th Cir. 2019)], the Fourth Circuit found fault with "the ALJ's reference to a 'non-production oriented work setting,'" as the Fourth Circuit "d[id] not know what the ALJ intended when she used that phrase," making it "difficult, if not impossible, to evaluate whether restricting [the plaintiff] to a 'non-production oriented work setting' properly accounted for [his] well-documented limitations in [CPP]." Perry, 765 F. App'x at 872. In so doing, the Fourth Circuit specifically distinguished its decision in *Sizemore v. Berryhill*, 878 F.2d 72 (4th Cir. 2017), where it "found that an ALJ had adequately explained a[n RFC] assessment that restricted the claimant, in part, to 'non-production jobs,'" as "the

> ALJ in *Sizemore* provided additional context, explaining
> that the claimant could perform work only in a 'low
> stress' setting, without any '<u>fast-paced work</u>' or 'public
> contact,' to account for moderate limitations in [CPP],"
> which "<u>descriptors helped to explain the restriction</u>
> <u>intended by the ALJ</u>, and allowed [the Fourth Circuit] to
> evaluate whether that restriction adequately accounted
> for the claimant's limitations." <u>Perry</u>, 765 F. App'x at
> 872 n.1.

<u>Ross v. Berryhill</u>, No. 1:17CV1145, 2019 WL 1430129, at *1 (M.D.N.C. Mar. 29, 2019) (unpublished) (Schroeder, C.J.) (emphasis added); <u>see also</u> <u>Thomas v. Berryhill</u>, 916 F.3d 307, 312 (4th Cir. 2019) (finding that ALJ's preclusion of "work 'requiring a production rate or demand pace'" and "'crisis situations, complex decision making, or constant changes in a routine setting'" did not suffice under facts of that case). As in <u>Ross</u> (and consistent with <u>Sizemore</u>, as construed in <u>Perry</u>), the ALJ here included the additional descriptors of "fast pace" and "few workplace changes" (Tr. 759), which "help[] to explain the restriction intended by the ALJ, and allow[ the Court] to evaluate whether that restriction adequately accounted for [Plaintiff's] limitations," <u>Perry</u>, 765 F. App'x at 872 n.1.

Third, the VE in this case did not express <u>any</u> difficulty in understanding the meaning of the words "fast-paced" in responding to the ALJ's dispositive hypothetical question. (Tr. 643.) The VE not only testified that Plaintiff's prior work as a Classifier conformed to a limitation to "no fast-paced production rate work" (<u>id.</u>), but also provided three other jobs that fit within that

restriction, Linen Room Attendant, Counter Supply Worker, and Dining Room Attendant (Tr. 644).

Fourth, at the hearing before the ALJ, Plaintiff failed to question the VE regarding the meaning of the phrase "no fast-paced production rate work" or how the jobs the VE cited adhered to that restriction, despite the fact that she had the opportunity (through her attorney) to cross-examine the VE. (See Tr. 647-49.) As a result, Plaintiff has waived, in this Court, any challenge to the ALJ's reliance upon (and adoption of) the VE's testimony that Plaintiff's PRW as a Classifier (and three additional jobs) could accommodate the ALJ's restriction to "no fast-paced production rate work" (Tr. 643-44, 764-66). See Stepinski v. Astrue, No. CA 11-183, 2012 WL 3866678, at *9-10 (D.R.I. Aug. 6, 2012) (unpublished) ("The [c]ourt views unfavorably the silence of [the p]laintiff's counsel at the hearing regarding the omission about which he now complains. Reversal and remand . . . would encourage other counsel to remain silent in similar circumstances. This [c]ourt is disinclined to provide such an incentive[] . . . [and] finds that [the p]laintiff waived this issue by failing to raise it before the ALJ." (internal citations omitted)), recommendation adopted, 2012 WL 3863812 (D.R.I. Sept. 5, 2012) (unpublished).

Plaintiff also argues that the ALJ "fail[ed] to explain how [Plaintiff] could remain on task for a full workday." (Docket Entry 13 at 10.) However, the ALJ's decision contains two findings

which establish that she did properly determine that Plaintiff could sufficiently maintain CPP to stay on task for a full, eight-hour workday.  First, the ALJ found at step three that, despite moderate deficit in CPP, Plaintiff could "<u>sustain</u> focused attention and concentration sufficiently long to permit the timely and appropriate <u>completion of tasks</u> commonly found <u>in routine and repetitive</u>, not detailed or complex, <u>work settings</u>."  (Tr. 758 (emphasis added).)  Second, the ALJ credited the reconsideration-level state agency psychological consultant's opinion that Plaintiff remained able to "<u>maintain</u> attention and concentration for <u>2 hours at a time</u> as required for the performance of simple tasks."  (Tr. 707, 725, 743 (emphasis added).)  Those findings suffice.  <u>See</u> <u>Sizemore</u>, 878 F.3d at 81 (finding ALJ's reliance on state agency consultant's opinion that the claimant could "maintain [attention] for at least two [hours] at a time as needed to do simple, routine tasks" sufficiently demonstrated the claimant's ability to "stay on task while performing 'simple one, two-step tasks,' as long as he was 'working in low stress non-production jobs with no public contact'").

In short, Plaintiff has failed to demonstrate prejudicial error under <u>Mascio</u>.

### 3. Supportability of ALJ's Conclusions

In Plaintiff's third assignment of error, she contends that the ALJ "dr[ew] conclusions that [we]re unwarranted and unsupported

by the record or by reason." (Docket Entry 13 at 14 (bold font and underscoring omitted).) However, none of Plaintiff's cited examples of alleged "unwarranted and unsupported" conclusions establish prejudicial error.

First, Plaintiff faults the ALJ for "describ[ing] [Plaintiff's] depression as 'situational,' (i.e., caused not by intrinsic mental impairment)," and argues that, "if stresses at home were disruptive to her mental health and to her functioning, there is no reason to conclude that stresses at work would not have a similar – and probably more severe – effect on her functioning because at home [Plaintiff] would have more control over her environment than she would have in the workplace." (Id. (quoting Tr. 761); see also Docket Entry 16 at 3-5.) Plaintiff's argument fails for two reasons. First, the ALJ remarked that "[t]he medical records [] show [Plaintiff] has been diagnosed with reactive depression" and that "[t]reatment notes reveal[ed] [Plaintiff's] depression [wa]s situational as she presented to her treating physicians with complaints of increased stressors at home, problems sleeping, nervousness and panic attacks." (Tr. 761 (emphasis added).) Thus, the ALJ did not characterize Plaintiff's depression as "reactive" and "situational" but rather correctly observed that Plaintiff's treating providers diagnosed her with that condition. (Id.; see also Tr. 1168, 1247.) Second, Plaintiff's argument "that stresses at work would [] have a similar – and probably more severe

– effect on her functioning" (Docket Entry 13 at 14) constitutes sheer speculation and overlooks the fact that the ALJ's RFC includes several restrictions aimed at reducing the amount of workplace stress Plaintiff would encounter, e.g., SRRTs, few workplace changes, and no fast pace production work (Tr. 759).

Second, Plaintiff challenges the ALJ's statement that Plaintiff "'has not been hospitalized for her mental health symptoms'" (Docket Entry 13 at 15 (quoting Tr. 761)), noting that "[t]he record contains evidence of a mental health hospitalization" which, in turn, indicates "that [Plaintiff] 'had [a] history of previous overdoses'" (id. (quoting Tr. 1039)). Although Plaintiff acknowledges that she "presumably" made her statement denying prior mental hospitalizations "to the psychological examiner [Dr. Cheri R. Anthony]," Plaintiff claims that, "[i]f [she] indeed said so, this is false." (Id.) A review of the ALJ's decision makes clear that she did not independently find as a fact that Plaintiff's mental health treatment history lacked any inpatient hospitalizations, but merely reported Plaintiff's apparent statement to Dr. Anthony to that effect during the consultative examination. (See Tr. 761; see also Tr. 1139.)

Third, Plaintiff criticizes the ALJ's observation that, despite Plaintiff's reporting of flashbacks and anxiety relating to abuse when she was a child, she "'was able to work for several years.'" (Docket Entry 13 at 16 (quoting Tr. 761).) According to Plaintiff,

she "never performed work at the SGA level[, ] what little work she did perform was generally unskilled[,] . . . [and] there is no evidence that the work she performed was unaccommodated, or . . . did not allow her to take more frequent breaks than would be permitted in a competitive work environment." (Id.)  As discussed above, the work Plaintiff performed as a Classifier did constitute SGA (see Tr. 950), and the VE categorized her prior work as a waitress as semi-skilled (see Tr. 641).  Moreover, Plaintiff bears the burden of establishing the duties and requirements of her PRW, see Lewis v. Berryhill, 858 F.3d 858, 861 (4th Cir. 2017), yet she did not produce any evidence that she required (or received) any sort of accommodation or allowance for extra breaks in her past employment.

Fourth, Plaintiff attacks the ALJ's finding of "'several inconsistencies throughout the record,'" and asserts that the ALJ failed to "point to a single one." (Docket Entry 13 at 16 (quoting Tr. 760).)  The ALJ provided the following analysis regarding inconsistencies:

> There are several inconsistencies throughout the record. Treatment notes [] show [Plaintiff] complained of headaches that caused blurred vision, facial numbness, dizziness and syncope.  Physical examination was unremarkable and EEG testing yielded normal results. [Plaintiff] had an implantable loop recorder implanted that the records state will stay for three years in order to track these episodes.  [Plaintiff] was prescribed medication and reported [sic] relieved her syncopal episodes.  Treatment notes further show [Plaintiff] complained of severe aching knee pain and that she further experiences swelling in the right knee after

25

standing for extended periods.  However, her treating
providers noted she was able to cross her legs with the
right leg and sit with a 90-degree bend of that knee
without difficulties.  Physical examination showed
[Plaintiff] exhibited tenderness to the right knee but no
swelling and was otherwise unremarkable.  She was treated
with pain medication, steroid injections, and a knee
brace that she stated gave her some relief.  [Plaintiff]
further complained of a persistent cough that was
productive at times.  Physical examination at a few
office visits was consistent with [Plaintiff's]
allegations and she was prescribed inhalers.  Treatment
notes show [Plaintiff] reported smoking every day and
continued to smoke despite her respiratory symptoms.  She
subsequently reported relief of her symptoms with use of
the inhalers, allergy medication and cough suppressants.

(Tr. 760-61 (internal citations omitted).)  In the above-quoted

analysis and earlier in the decision, the ALJ pointed out the

following inconsistencies in the record:

- Plaintiff "stated she has asthma and experiences
  shortness of breath with exertion," but Plaintiff
  "indicated she is able to take care of her personal
  needs without assistance, take care of her cat,
  cook for herself, do household chores while taking
  breaks, [] shop for herself[,] . . . [and] swim[]
  at her daughter's house" (Tr. 759);[7]

- despite Plaintiff's complaints of headaches and
  syncope, "[p]hysical examination was unremarkable,"
  "EEG testing yielded normal results," and Plaintiff
  reported that medication "relieved her syncopal
  episodes" (Tr. 760);

- although Plaintiff reported severe knee pain,
  examination showed "tenderness . . . but no
  swelling and was otherwise unremarkable," and

---

[7] Plaintiff contends that her claim of shortness of breath with exertion does not
conflict with the list of activities the ALJ cited, because Plaintiff could only
"perform th[o]se 'chores while taking breaks.'" (Docket Entry 13 at 17 (quoting
Tr. 759).)  However, Plaintiff glosses over the fact that the ALJ qualified only
Plaintiff's ability to perform household chores with a need to take breaks (see
Tr. 759) and thus the ALJ found the totality of daily activities Plaintiff could
perform, including household chores with breaks, inconsistent with her claims of
disabling shortness of breath with exertion.

26

Plaintiff found "some relief" through "pain medication, steroid injections, and a knee brace" (Tr. 760-61);[8]

- in spite of Plaintiff's assertion of "a persistent cough," Plaintiff "reported smoking every day," "continued to smoke despite her respiratory symptoms," and "subsequently reported relief of her symptoms with use of [] inhalers, allergy medication and cough suppressants" (Tr. 761).[9]

Accordingly, Plaintiff has not shown that the ALJ reached "unwarranted and unsupported" conclusions that would require reversal or remand.

---

[8] Plaintiff faults the ALJ for citing Plaintiff's "'ab[ility] to cross her legs . . . without difficulties'" as inconsistent with her reports of severe knee pain (Docket Entry 13 at 16 (quoting Tr. 761)), arguing that "[t]he two sentences have no apparent relation to one another, and unless the ALJ were a testifying physician, there is not an evident inconsistency between crossing legs for a moment in an examining room (presumably while seated) and experiencing pain and swelling after standing for a few hours" (id.). As an initial matter, Plaintiff omitted the remainder of the ALJ's statement that Plaintiff could "cross her legs with the right leg and sit with a 90-degree bend of that knee without difficulties." (Tr. 761.) Moreover, Plaintiff neglects to mention that the ALJ's remark paraphrased the observation of Plaintiff's treating nurse practitioner, Amanda Beasley, who noted that, despite Plaintiff's complaint of right medial knee pain, "[w]hile sitting and talking, [Plaintiff] was able to cross her legs with the RIGHT leg and also sit with a 90 degree bend of that knee (Valgus like position) without difficulties" (Tr. 1202 (capitalization in original)).

[9] Plaintiff argues that the ALJ's two statements that Plaintiff "complained of a persistent cough" and "'[p]hysical examination at a few office visits was consistent with [Plaintiff's] allegations [of a persistent cough] and she was prescribed inhalers'" contain "no apparent inconsistencies." (Docket Entry 13 at 17 (quoting Tr. 761).) This argument overlooks the ALJ's use of the modifier "few" before "office visits," which indicates that most of the office visits did <u>not</u> corroborate Plaintiff's complaint of a persistent cough, as well as the ALJ's remarks about Plaintiff's continued smoking and reported relief with treatment modalities, both of which provide evidence inconsistent with Plaintiff's reports of a disabling persistent cough. (<u>See</u> Tr. 761.)

# 4. Opinion Evidence[10]

Plaintiff raises three contentions of error with respect to the ALJ's evaluation of the opinion evidence. First, Plaintiff contends that the ALJ accorded substantial weight to the opinions of psychological consultative examiner Dr. Anthony, but "fail[ed] to discuss why portions of Dr. Anthony's report that were inconsistent with the [ALJ's] conclusions were not also given substantial weight." (Docket Entry 13 at 17 (referencing Tr. 762-63).) In particular, Plaintiff faults the ALJ for noting Dr. Anthony's opinion that Plaintiff "'may have some difficult[ies] managing stress associated with a routine work environment,'" but failing to mention "the previous sentence" that Plaintiff "'does appear to have poor stress management and limited stress tolerance.'" (Id. at 18 (quoting Tr. 1144).) However, ALJs labor under no obligation to discuss each and every finding in the medical opinions of record. See Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). Moreover, the ALJ expressly discussed the more significant of Dr. Anthony's opinions that translated Plaintiff's difficulties handling stress into a work-related limitation. (See Tr. 761.) Plaintiff makes no argument that the RFC's restrictions to SRRTs, few workplace changes, and no fast pace production work (see Tr.

_____

[10] The last contention in Plaintiff's third assignment of error (see Docket Entry 13 at 17-18), as well as Plaintiff's fourth and fifth assignments of error (see id. at 18-21), all involve allegations of error relating to the ALJ's evaluation of the opinion evidence of record. Thus, this Recommendation will address those arguments together.

759) inadequately encompass Dr. Anthony's equivocal opinion that Plaintiff "may have some difficulties managing stress associated with a routine work environment" (Tr. 1144 (emphasis added)). (See Docket Entry 13 at 17-18.)

Second, Plaintiff faults the ALJ for using the following boilerplate in evaluating and weighing the opinions of Dr. Anthony, consultative medical examiner Dr. Larry Gish, and consultative medical examiner Dr. Stephen Burgess:

> "[The opinions/findings are] well supported by objective diagnostic testing, his [or her] trained observations, an impartial analysis of the evidence of record, and a well-reasoned conclusion. He [or she] documented and attempted to resolve contradictions with input from [Plaintiff] and analyzed [Plaintiff's] statements in view of [Plaintiff's] daily activities, history, and previous work experience."

(Id. at 18-19 (quoting Tr. 761-62); see also Docket Entry 16 at 5-7.) According to Plaintiff, "it is difficult, on account of the boilerplate language . . ., to believe that these reports were each evaluated on its [sic] own merits" (Docket Entry 13 at 19), and/or that the ALJ adequately "expla[ined] the weight given to these respective opinions" (id. at 20). Plaintiff further observes that "the record shows no evidence of objective diagnostic testing in the reports of Dr. Anthony, Dr. Gish, and Dr. Burgess" and that "the decision ought to be expected to point to specifically what testing, what observations, and what analysis of the evidence to which it refers." (Id. (internal quotation marks omitted.)

Plaintiff's argument focuses solely on the ALJ's alleged boilerplate language and omits the ALJ's detailed discussion of each of the three consultants' examination findings (see Tr. 761-63). (Docket Entry 13 at 18-20; see also Docket Entry 16 at 5-7.) As a result of the ALJ's thorough discussion of the consultants' findings, the Court can ascertain that the ALJ did evaluate the consultants' reports on their respective merits and determine the basis for "the weight given to [the consultants'] respective opinions" (Docket Entry 13 at 20).[11] More significantly, given that no opinion evidence exists in the record that proffers greater restrictions than those contained in the ALJ's RFC, Plaintiff has failed to show how further explanation by the ALJ of the weight accorded to those opinions would have changed the ultimate outcome in her case.

---

[11] Plaintiff's contention that "the record shows no evidence of objective diagnostic testing in the reports of Dr. Anthony, Dr. Gish, and Dr. Burgess" (Docket Entry 13 at 20) also warrants no relief. Dr. Gish conducted a physical examination of Plaintiff, which included objective, diagnostic methodologies such as testing Plaintiff's heart rate and oxygen saturation after a fast walk, taking her blood pressure, and using a stethoscope to assess Plaintiff's lungs and heart (auscultation). (See Tr. 1149-50.) Dr. Burgess also performed a physical examination of Plaintiff, which included auscultation of Plaintiff's lungs and heart, measurement of Plaintiff's arm and leg circumferences, and x-rays of Plaintiff's lumbar spine and right knee. (See Tr. 1188-89, 1194-96.) Although Dr. Anthony tested Plaintiff's orientation, attention, memory, fund of information, abstract reasoning, and judgment on mental status examination (see Tr. 1142-43), because those tests primarily rely on Plaintiff's subjective responses, the ALJ arguably erred by finding that "Dr. Anthony's opinion [wa]s well supported by objective diagnostic testing" (Tr. 761 (emphasis added)). However, because the ALJ specifically (and accurately) discussed Dr. Anthony's findings on mental status examination (see id.), Plaintiff has not shown how correction of the ALJ's minor error in this regard would impact the weight the ALJ accorded to Dr. Anthony's opinion, let alone the ultimate outcome in the case.

Third, Plaintiff asserts that, "while the [ALJ] appear[ed] to give, in collective fashion, the state agency medical and psychological consultants' opinions 'significant weight'" (Docket Entry 13 at 20-21 (quoting Tr. 763)), and "note[d] that [reconsideration-level state agency psychological consultant Dr. Nelson] stated that [Plaintiff] continued to be able to 'maintain [CPP] for periods of two hours as required for the performance of simple tasks'" (id. at 20 (quoting Tr. 763 (in turn referencing Tr. 707, 725, 743))), the ALJ failed to mention that Dr. Nelson also found that Plaintiff "was moderately limited in the 'ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods'" (id. (quoting Tr. 707, 725, 743)).

Plaintiff's argument fails, because the moderate limitation in the ability to complete a workday/workweek appears in the portion of the mental RFC form which the state agency psychological consultants use as "merely a worksheet to aid in deciding the presence and degree of functional limitations . . . and does not constitute the RFC assessment." Program Operations Manual System ("POMS") DI 24510.060B.2.a (bold font omitted). The state agency consultants assess the actual mental RFC in the narrative portion of the form. See POMS DI 24510.060B.4. Here, despite moderate limitation in the ability to complete a workday/workweek, Dr. Nelson

concluded in the narrative portion of the mental RFC form that Plaintiff could "maintain attention and concentration for 2 hours at a time as required for the performance of simple tasks" (Tr. 707, 725, 743) and remained "capable of doing SRRTs" (Tr. 708, 726, 744). The ALJ did not err by relying on Dr. Nelson's narrative mental RFC assessment.  See Jones v. Commissioner of Soc. Sec., 478 F. App'x 610, 612 (11th Cir. 2012) (rejecting the claimant's contention that ALJ should have accounted in RFC for moderate limitations identified on mental RFC assessment form, and noting that the limitations "are only part of a worksheet that does not constitute the doctors' actual RFC assessment" (brackets and internal quotation marks omitted)); Smith v. Commissioner of Soc. Sec., 631 F.3d 632, 636-37 (3d Cir. 2010) (finding no error where ALJ did not include in hypothetical question moderate limitations contained in worksheet part of mental RFC form, concluding that the claimant could not "rely on the worksheet component" of mental RFC form); Johansen v. Barnhart, 314 F.3d 283, 288-89 (7th Cir. 2002) (upholding ALJ's reliance on narrative mental RFC assessment rather than subsidiary findings of moderate limitations in the claimant's ability to maintain a regular schedule and attendance and to complete a normal workday and workweek).

In light of the above analysis, Plaintiff has failed to demonstrate prejudicial error arising out of the ALJ's evaluation of the opinion evidence of record.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 12) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

August 9, 2019